### The ANSCHUTZ CORPORATION

v.

### Joseph L. WAITZ.

### Civ. A. No. 82–5461.

United States District Court, E.D. Louisiana.

April 17, 1984.

---

James M. Funderburk, Houma, La., for plaintiff.

Huntington B. Downer, Jr., Houma, La., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BEER, District Judge.

To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are so adopted.

### Findings of Fact

1. On November 14, 1979, Joseph Waitz, a Louisiana citizen, signed a letter agreement with The Anschutz Corporation, a Colorado corporation, dated October 31, 1979. Under the letter agreement, Waitz paid $18,523.70 for a one-quarter interest in a mineral lease in the Lake Coquille area.

2. Anschutz had successfully bid for the lease, which was described as:

> Oil, Gas and Mineral Lease dated September 17, 1979, between the State of Louisiana, as Lessor, and The Anschutz Corporation, as Lessee, covering 1,512 acres, more or less, located in St. Bernard Parish, Louisiana, and recorded in Mineral Lease Book 45, Folio 46, records of said Parish and State.

3. Under the letter agreement, Anschutz was to be the operator of the lease. The letter agreement incorporated an Operating Agreement also dated October 31, 1979, signed by Waitz and an officer of Anschutz. Under the Operating Agreement, Anschutz was to oversee the exploration and drilling, and manage the joint account.

4. The Operating Agreement provided for monthly billings to non-operators for proportionate shares of the joint account.

5. Under the Operating Agreement, a non-operator could contest a billing by written exception within twenty-four months of the end of the applicable calendar year; a non-operator could audit Anschutz' accounts and records upon written notice, subject to the same time limitation.

6. From November 22 and December 5, 1979, Dresser Industries made four deliveries of mud and supplies to Well # 8319 on the subject lease. In accordance with industry practice, a large amount of material equal to the total estimated use was delivered. The unused amount was later returned to Dresser.

7. Anschutz received a credit, dated February 27, 1980, from Dresser in the amount of $17,746.52, representing the return of materials from the well. Waitz received a proportionate share of this credit on his Anschutz billing. Inexplicably, Anschutz had not yet received the invoice from Dresser for the four year-end deliveries. This oversight on Dresser's part went unnoticed until much later.

8. From September 1979 to the end of February 1980, Waitz had received eight invoices from Anschutz totalling $123,208.72.

9. Tom West had agreed to monitor the Anschutz billings for Waitz. West recommended that Waitz send a check for $50,000 to Anschutz, which was done on April 1, 1980. Anschutz received the check on April 4.

10. Anschutz sent a request on April 11 for the balance of $73,208.72.

11. Waitz asked West to confirm the amount. Calling the Anschutz accounting office in Denver, West spoke to a Debbie Michela, who referred him to a chief accounting officer.

12. Although West did not receive the third party invoices which he had requested, he recommended to Waitz that he pay the balance, on the basis of the computer printouts he had received and the representations made to him in the telephone conversation with the Denver office.

13. Waitz accordingly mailed a check for $70,280.58 to Anschutz on July 14, 1980.

14. Although the note accompanying the check said merely that it was to be applied to Waitz' account, both Waitz and West considered the payment to be a final settlement of Waitz' account. West thought he had reached such an understanding with the Denver chief accounting officer, but no supporting evidence of any such agreement was offered at trial.

15. Waitz received a bill dated July 17, 1980 from Anschutz in the amount of $649, reflecting his share of tax work performed by Peat, Marwick and Mitchell.

16. Waitz received a bill dated September 16, 1981 from Anschutz for $565 arising out of subsequent tax preparation by Peat, Marwick and Mitchell.

17. Waitz received a bill dated September 18, 1981 from Anschutz in the amount of $11,421.30, his share of the four deliveries from Dresser in late 1979 which had totalled $45,685.21. Anschutz had received the Dresser invoice almost twenty-two months late, on September 9, 1981.

18. Alarmed, Waitz asked by telephone for supporting documentation from Anschutz. Between his receipt of the bill and the filing of this lawsuit on November 29, 1982, in fact, Waitz made repeated telephone requests for supporting invoices, but received only the computer printouts reflecting Anschutz' own records of the invoices.

19. Although Waitz does not contest the two Peat, Marwick and Mitchell bills, he has refused to pay the late Dresser billing, alleging prescription, negligence, failure to document the billing, lack of authority to incur the debt, non-delivery of the materials, and discharge or satisfaction.

### Conclusions of Law

1. This court has jurisdiction over this matter based on diversity of citizenship of the parties.

2. Louisiana law governs.

3. A preponderance of the evidence did not indicate negligence in the failure of Anschutz to notice the unreceived Dresser invoice; nor has any pecuniary damage resulting from the alleged negligence been shown.

4. Although the Dresser credit and invoice referred to Well #8319 as #8391, the evidence showed that the four deliveries were in fact made to Well #8319, operated by Anschutz pursuant to the subject Operating Agreement.

5. Without foreclosing the possibility that Waitz sent a written request to Anschutz for the Dresser invoice, the failure of Anschutz to document the billing beyond computer printouts does not bar Anschutz' right to collect on the account. The evidence has made clear that the debt is owing, thus mooting the right to object or audit under the Operating Agreement.

6. Anschutz had authority to incur the disputed expense.

7. The debt has not prescribed. Louisiana Civil Code Article 3538.

8. Defendant did not establish by a preponderance of the evidence that Anschutz or any of its employees had agreed orally to a discharge or settlement of Waitz' account, and, at any rate, the required writing indicating such an agreement was not made. See Louisiana Civil Code Article 3071.

9. Although the delay in finalizing Waitz' account was perhaps unbusinesslike, and his resentment at the surprising late

bill certainly understandable, no legal basis for refusing payment has been shown.

10. Interest is awarded from the date of judicial demand at the rate which would apply had this matter been tried in a Civil District Court in the State of Louisiana, each party to bear its own costs.

Counsel for plaintiff will prepare a judgment consistent with these findings and conclusions.